AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>THE CELLULAR TELEPHONE ASSIGNED CALL<br>NUMBER (513) 886-8668, WITH IMSI<br>310260201426557 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. **1:22-MJ-00001** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (incorporated by reference). This court has authority to issue this warrant under 18 U.S.C. §§ 2703 (c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ New Jersey _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1349 | Conspiracy to Commit Mail Fraid |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of _30_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant will also function as a pen register order. I therefore certify that the information likely to be obtained is relevant to an ongoing criminal investigation conducted by ATF. See 18 U.S.C. §§ 3122(b), 3123(b). /s/Julie D. Garcia

_____
*Applicant's signature*

Aaron Bauder, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ FaceTime videoconference _____ *(specify reliable electronic means).*

Date: **Jan 3, 2022**

*Stephanie K. Bowman*
*Judge's signature*

City and state: Cincinnati, Ohio

Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

1.      The cellular telephone assigned call number **(513) 886-8668,** with International Mobile Subscriber Identity 310260201426557, with listed subscriber Delove Amuzu (the "Target Cell Phone"), whose wireless service provider is T-Mobile US, Inc., a company headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

2.      Records and information associated with the Target Cell Phone that are within the possession, custody, or control of T-Mobile US, Inc., including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

### I. Information to be Disclosed by the Provider

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile US, Inc., T-Mobile US, Inc. is required to disclose the Location Information to the government. In addition, T-Mobile US, Inc. must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile US, Inc.'s services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile US, Inc.'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile US, Inc. for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to Be Seized by the Government

1. All information described above in Section I that constitutes evidence of violations of 18 U.S.C § 1349 involving DELOVE KOFI AMUZU; and

2. All information described above in Section I that will assist in arresting AMUZU, who was charged on December 21, 2021, with violating 18 U.S.C. § 1349; who is the subject of an arrest warrant issued on December 21, 2021; and who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (513) 886-8668, WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY 310260201426557 | Case No. **1:22-MJ-00001**<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Aaron Bauder, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (513) 886-8668, with International Mobile Subscriber Identity 310260201426557, with listed subscriber(s) "Delove Amuzu" (the "**Target Cell Phone**"), whose service provider is T-Mobile US, Inc., a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.      I have been employed as a Special Agent with the FBI since 2019 and am currently assigned to the White Collar Crimes Squad of the Cincinnati Field Office. In this capacity, I investigate white collar crimes, including civil rights violations, money laundering, and various types of fraud. Since 2019, I have received training and experience in interview and interrogation techniques, arrest procedures, search warrants, and various other investigative techniques.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1349 have been committed, are being committed, and/or will be committed by DELOVE KOFI AMUZU.  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that AMUZU has violated 18 U.S.C. § 1349; AMUZU was charged by Criminal Complaint with these crimes on December 21, 2021, and is the subject of an arrest warrant issued on the same date. There is also probable cause to believe that the location information described in Attachment B will assist law enforcement in arresting AMUZU, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

7.      The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court

2

of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

## **PROBABLE CAUSE**

### A. **Introduction**

8.       The FBI and the U.S. Attorney's Office for the Southern District of Ohio are investigating a suspected "romance fraud" scheme being perpetrated by DELOVE KOFI AMUZU and others known and unknown. As I explain below, in furtherance of the conspiracy, AMUZU, a former resident of Fairfield, Ohio, received mailings in the Southern District of Ohio.

9.       Based on my training and experience, I know the following about romance fraud schemes:

   a.       Perpetrators of romance fraud schemes commonly create false profiles on dating websites using false information and stolen pictures of individuals. In this Affidavit, I will call these imaginary attractive individuals the "Romantic Partner(s)."

   b.       The perpetrators use the false online profiles to initiate contact with victims.

   c.       Once the perpetrators have initiated contact with a victim, pretending to be a Romantic Partner, they communicate with the victim primarily by messaging services. By expressing romantic interest in the victim, the perpetrators mislead the victim into believing he or she is in a relationship with the Romantic Partner.

   d.       The perpetrators commonly represent that the Romantic Partner is currently abroad, providing a justification as to why the Romantic Partner is never able to meet the victim in person.

e.  Once the victim believes he or she is in a romantic relationship with the Romantic Partner, the perpetrators begin asking the victim to send money and/or other items of value. Commonly, the Romantic Partner falsely represents that he or she is expecting a large inheritance of gold bars and is seeking to bring the gold bars to the United States. The Romantic Partner induces the victim to send money to pay for expenses associated with the gold inheritance. Other false representations that Romantic Partners commonly make are that they need money for a plane ticket to visit the victim, money for bail after being falsely imprisoned, or money to pay medical bills. In fact, the money and valuables the victims send to the perpetrators are used for other purposes.

**B.  In 2018, VICTIM 1 developed an online romantic relationship with someone calling himself "Marvin Anderson," who directed VICTIM 1 to send him thousands of dollars.**

10.  I interviewed VICTIM 1 in March 2020. VICTIM 1 told me that, in approximately April 2018, VICTIM 1 met an individual online who called himself "Marvin Anderson." After speaking with Anderson by phone and email, VICTIM 1 developed what she believed was a romantic relationship with Anderson.

11.  VICTIM 1 said Anderson spoke with a foreign accent. VICTIM 1 said Anderson claimed to live near VICTIM 1 but said he was working on a construction project in Egypt.

12.  At some point, Anderson said he and his daughter were traveling to Egypt, and he asked VICTIM 1 to send money to assist with their travel costs, which VICTIM 1 did. VICTIM 1 estimated that, in total, she had sent Anderson approximately $75,000.

13.  VICTIM 1 said that, in August 2018, she told Anderson that if he wanted to continue their relationship, he would have to meet her in person. Anderson declined, and the relationship ended.

4

**C. After breaking up with "Anderson," VICTIM 1 met "Dion Wilson," who directed her to send valuables to AMUZU in Cincinnati, Ohio.**

14.     VICTIM 1 said that, later in August 2018, shortly after breaking up with "Anderson," VICTIM 1 met an individual online who went by the name "Dion Wilson." VICTIM 1 said that Wilson, like Anderson, spoke with a foreign accent.

15.     Wilson told VICTIM 1 he knew two FBI agents in Egypt who could assist VICTIM 1 in finding Anderson and retrieving her money. Wilson put VICTIM 1 in touch with one of the alleged FBI agents, "Carol." VICTIM 1 said that, at Carol's request, VICTIM 1 had sent Carol $25,000 to begin looking for Anderson.

16.     VICTIM 1 said Wilson then introduced her to a person I will call COCONSPIRATOR 1, who Wilson said was his banker. Wilson told VICTIM 1 that COCONSPIRATOR 1 would handle the financial side of the investigation. VICTIM 1 said that, when she spoke with COCONSPIRATOR 1 by phone, he also had a foreign accent.

17.     VICTIM 1 shared her bank information with COCONSPIRATOR 1, and between September and November of 2018, she noticed money being stolen from her accounts and from her home equity loan. When she addressed the issue with Wilson, he blamed COCONSPIRATOR 1 for "stealing from us."

18.     VICTIM 1 said Wilson also asked her to purchase items for what he described as his coffee bean business, "Evergreen." VICTIM 1 said Wilson had provided a link to a website with a video about the company and had shown her information showing that Evergreen's bank account contained $23 million.

19.     VICTIM 1 said that, at Wilson's direction, she had purchased several items, such as computers, iPhones, iPads, laptops, and Rolex watches, and mailed these items to AMUZU in

Cincinnati, Ohio. VICTIM 1 never spoke directly with AMUZU, but Wilson told VICTIM 1 that

AMUZU was in the process of purchasing Evergreen.

### D. Wilson also directed VICTIM 1 to send money to accounts controlled by AMUZU, allegedly to assist with the sale of Evergreen to AMUZU.

20.     VICTIM 1 said that, at Wilson's direction, she also sent money to accounts in the

name of Obdomdel Management Agency LLC, an Ohio LLC whose registered agent is (and at

the time was) AMUZU.

21.     Records from VICTIM 1's financial accounts show that on November 8, 2018, a

wire transfer for $97,000 cleared from VICTIM 1's account at Canvas Credit Union to an

account at Bank of America in the name of Obdomdel Management Agency LLC, with an

account number ending in 9130 ("Bank of America Account 9130"). At the time of the

transaction, AMUZU was listed as the sole owner/signer on Bank of America Account 9130,

which had a registered address of 11 Camelot Circle Apt. J in Fairfield, Ohio.

22.     Bank records also show that, the next day, November 9, 2018, a wire transfer for

$85,000 cleared from Obdomdel Management Agency LLC's Bank of America Account 9130

account to a bank account in Ghana (AMUZU's home country). The subject line for the wire

said, "PURCHASE OF HOUSE."

23.     Bank records also show that on November 10, 2018, VICTIM 1 sent a cashier's

check from Canvas Credit Union, payable to Obdomdel Management Agency LLC (AMUZU's

LLC), for $101,000. On November 13, 2018, the check cleared to an account in the name of

Obdomdel Management LLC, with an account number ending in 7163, at Wells Fargo Bank

("Wells Fargo Account 7163"). As of that date, AMUZU was the sole owner and signer on Wells

Fargo Account 7163, which had a registered address of 11 Camelot Circle Apt. J in Fairfield, Ohio.

**E. VICTIM 2 began a romantic relationship online with "Christian Coleman," who directed VICTIM 2 to send money to accounts controlled by AMUZU.**

24.     An Investigator for the Butler County Prosecutor's Office interviewed VICTIM 2 in April and October 2019. An FBI agent interviewed VICTIM 2 again via telephone in May 2020.

25.     VICTIM 2 said that, in approximately 2017, she met an individual who called himself "Christian Coleman" on the online dating website "Plenty of Fish," and the two developed a romantic relationship. VICTIM 2 said Coleman had spelled his name several different ways over the course of their communications.

26.     VICTIM 2 said Coleman claimed to be an engineer who was on an extended trip overseas. Coleman led VICTIM 2 to believe that he had attempted to return to the United States several times during their relationship, but he always had an excuse as to why he had to remain overseas.

27.     VICTIM 2 said that, on Coleman's behalf, she had accepted, at her home in Cincinnati, three packages that had been sent to her via mail. According to VICTIM 2, one of the packages contained $50,000 in cash, and the others contained office equipment such as computer screens.

28.     VICTIM 2 said that, at Coleman's direction, she had worked with COCONSPIRATOR 1—same person "Dion Wilson" told VICTIM 1 was his banker—to transfer money and valuables.

7

29.     VICTIM 2 said that, at some point, Coleman told VICTIM 2 he wanted to come back to the United States to start a new business. He explained to VICTIM 2 that he had multiple investors lined up and would need additional funding from her. Coleman then connected her to an individual who lived in Fairfield, Ohio, who Coleman said would receive money from her on Coleman's behalf. (As of May 2020, VICTIM 2 could not remember the name of the person living in Fairfield, Ohio; however, AMUZU was associated with an address in Fairfield, Ohio, as of 2018, and, as I explain below, bank records show that VICTIM 2 sent money to accounts controlled by AMUZU, including an account in his name.)

30.     Bank records show that, in November 2018, VICTIM 2 sent approximately $74,300 to Obdomdel Management Agency LLC and to bank accounts in AMUZU's name. Specifically, on November 26, 2018, a counter deposit for $36,500, drawn from VICTIM 2's account at PNC Bank, cleared to an account in AMUZU's name at BB&T Bank ("BB&T Account 7112"). Shortly thereafter, on November 30, 2018, a wire transfer for $35,800 from VICTIM 2's PNC Bank account cleared to Obdomdel Management LLC's Bank of America Account 9130.

**F. VICTIM 3 began an online romantic relationship with "Hannah Arthur," who directed him to send money and valuables to AMUZU, allegedly to help her pay taxes on millions of dollars in gold she was inheriting.**

31.     On November 10, 2020, an FBI agent interviewed VICTIM 3. I have reviewed the agent's interview report, as well as supporting documentation provided by VICTIM 3's daughter.

32.     VICTIM 3 said that, in March 2020, he met an individual using the name "Hannah Arthur" (hereafter "Hannah") on a dating website called "Rendezvous." Although VICTIM 3 had never met Hannah in person, by exchanging messages on WhatsApp and Google

Hangouts VICTIM 3 and Hannah developed what VICTIM 3 believed was a romantic relationship. VICTIM 3 said Hannah had an American accent.

33.     VICTIM 3 said that Hannah told him she was a student in Ghana who had just inherited $8,500,000 in gold bars and other various currencies. Hannah asked VICTIM 3 to send money to pay the taxes, fees, and tariffs necessary to release the gold bars.

34.     VICTIM 3 said Hannah had directed him to send cashier's checks to several individuals to get the gold bars released. VICTIM 3 said that, among the people to whom Hannah directed VICTIM 3 to send money was AMUZU, at three different addresses in Ohio.

35.     VICTIM 3 said that Hannah had also directed him to send multiple cell phones to AMUZU at an address in Bronx, New York.

36.     VICTIM 3's daughter provided a spreadsheet showing payments and shipments VICTIM 3 had made at Hannah's direction. Among the payments and shipments listed were the following:

| Date | Amount / Items | Recipient Account or Mail-to Address |
|------|----------------|--------------------------------------|
| 7/17/2020 | $60,376.00 cashier's check deposit | [another known victim, G.H.] |
| 7/30/2020 | $101,000.00 cashier's check deposit | [G.H.] |
| 8/14/2020 | $26,500.00 cash deposit | Delove Kofi Amuzu [Redacted], Fairfield, OH 45104 |
| 9/12/2020 | $65,000.00 cashier's check deposit | Delove Kofi Amuzu, [Redacted], Cincinnati, OH 45251 |
| 10/9/2020 | 16 iPhones | Delove Kofi Amuzu, [Redacted] Walton Ave. Apt. [Redacted], Bronx, NY 10452 |

37.     Bank records show that on August 14, 2020, a counter deposit for $26,500 cleared to an account at BB&T with an account number ending in 1162 ("BB&T Account 1162"). This payment corresponds to one that VICTIM 3's daughter's spreadsheet lists as a "Cash Deposit"

9

made by VICTIM 3 on August 14, 2020. As of August 14, 2020, AMUZU was the sole owner of and signer on BB&T Account 1162.

38.     Bank records also show that on September 14, 2020, a counter deposit from VICTIM 3's Wells Fargo cashier's check #6888903115, for $65,000, cleared to AMUZU's BB&T Account 1162. This payment appears to correspond to another payment that VICTIM 3's daughter's spreadsheet lists as a "cashier's check deposit," which VICTIM 3 made on September 12, 2020.

### G. In 2018, VICTIM 4 began an online romantic relationship with "Noel Hernandez" and was directed to send money to AMUZU's PayPal account.

39.     In November 2018, VICTIM 4 submitted an IC3 Complaint in which he claimed to have been the victim of a romance fraud scheme involving AMUZU.

40.     In April 2020, an FBI agent interviewed VICTIM 4, who explained that in September 2018 he had gotten into an online relationship with "Noel Hernandez," who claimed to be a sergeant in the U.S. Army. According to VICTIM 4, Hernandez originally claimed to be stationed in London but later claimed she had moved to Africa. Hernandez told VICTIM 4 she could not provide specifics as to her location for security reasons.

41.     Eventually, Hernandez told VICTIM 4 that she had an inheritance coming to her in the form of gold and diamonds but that the gold had gotten "hung up" in customs. Hernandez told VICTIM 4 that she needed money to get the gold released. VICTIM 4 explained that, at Hernandez's direction, he ended up sending money to five different locations, for a total of approximately $150,000 in loss.

42.     VICTIM 4 said he was directed to send money to DELOVE AMUZU via PayPal. In his IC3 Complaint, VICTIM 4 said AMUZU's email address was DELOVEAMUZU98@YAHOO.COM.

43.     I reviewed financial records showing that on November 9, 2018, VICTIM 4 sent three payments via PayPal, totaling $12,000, to a PayPal account in the name of DE LOVE AMUZU, which has a registered email address of DELOVEAMUZU98@YAHOO.COM.

44.     Bank records also show that on October 30, 2018, and November 2, 2018, VICTIM 4 wired $4,000 and $10,000, respectively, to an account in the name of Obdomdel Management Agency LLC (on which account AMUZU was then the sole signer). The memo line on both transfers was "Securities/[VICTIM 4's last name]/Hernandez."

**H. The Target Cell Phone is the registered phone number on several of AMUZU's PayPal accounts, and he told someone in an email that it was his number.**

45.     In July 2021, PayPal produced records showing that AMUZU was the listed subscriber for several PayPal accounts, including the PayPal account at which he received payments from VICTIM 4. Several of AMUZU's accounts listed the **Target Cell Phone** as an associated telephone number.

46.     The PayPal records also showed that a mobile login was conducted to PayPal account 1342769463330053877 (registered in AMUZU's name, with the **Target Cell Phone** listed as an associated phone number) on July 16, 2021. The IP address shown for the login was 154.160.25.230. An open-source search of this IP address indicated the user logged in from somewhere in the vicinity of Accra, Ghana. Based on flight records showing AMUZU flew to Ghana in July 2021 and flew back to the United States in December 2021, I believe AMUZU was in Ghana at the time of that mobile login.

11

47.     Additionally, I have reviewed the results of a search warrant for AMUZU's email address, DELOVEAMUZU98@YAHOO.COM. In that account, I found the email below, dated December 19, 2019, in which AMUZU tells another individual that the **Target Cell Phone** is his number:



### G. The Target Cell Phone is registered to AMUZU, and T-Mobile's records list it as an active account.

48.     On January 3, 2022, T-Mobile US, Inc. produced records showing that the registered account holder for the **Target Cell Phone** is "Delove Amuzu" and that the account is active. The records further show that the phone has a subscriber address on Walton Avenue in Bronx, NY; this subscriber address is the same address to which VICTIM 3 was directed to send 16 iPhones, as noted above.

### H. T-Mobile likely has relevant evidence.

49.     In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively

12

precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

50. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on T-Mobile's network or with such other reference points as may be reasonably available.

51. Based on my training and experience, I know that T-Mobile can collect cell-site data about the **Target Cell Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

13

## **AUTHORIZATION REQUEST**

52.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

53.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

54.     I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the **Target Cell Phone** on T-Mobile's network or with such other reference points as may be reasonably available, and at

14

such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

55.    I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phone** outside of daytime hours.

56.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

AARON BAUDER
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on January ___3___, 2022.
**via electronic means, specifically Facetime video.**

HON. STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

15

## ATTACHMENT A

### Property to Be Searched

1.      The cellular telephone assigned call number **(513) 886-8668,** with International Mobile Subscriber Identity 310260201426557, with listed subscriber Delove Amuzu (the "Target Cell Phone"), whose wireless service provider is T-Mobile US, Inc., a company headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

2.      Records and information associated with the Target Cell Phone that are within the possession, custody, or control of T-Mobile US, Inc., including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## **ATTACHMENT B**

### **Particular Things to be Seized**

#### **I. Information to be Disclosed by the Provider**

All information about the location of the Target Cell Phone described in Attachment A

for a period of thirty days, during all times of day and night. "Information about the location of

the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude

data, and other precise location information, as well as all data about which "cell towers" (i.e.,

antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers)

received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter,

"Location Information") is within the possession, custody, or control of T-Mobile US, Inc., T-

Mobile US, Inc. is required to disclose the Location Information to the government. In addition,

T-Mobile US, Inc. must furnish the government all information, facilities, and technical

assistance necessary to accomplish the collection of the Location Information unobtrusively and

with a minimum of interference with T-Mobile US, Inc.'s services, including by initiating a

signal to determine the location of the Target Cell Phone on T-Mobile US, Inc.'s network or with

such other reference points as may be reasonably available, and at such intervals and times

directed by the government. The government shall compensate T-Mobile US, Inc. for

reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this

warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18

U.S.C. § 3103a(b)(2).

## II. Information to Be Seized by the Government

1.  All information described above in Section I that constitutes evidence of violations of 18 U.S.C § 1349 involving DELOVE KOFI AMUZU; and

2.  All information described above in Section I that will assist in arresting AMUZU, who was charged on December 21, 2021, with violating 18 U.S.C. § 1349; who is the subject of an arrest warrant issued on December 21, 2021; and who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.